[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 10-11209 ; 10-11251
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 21, 2011
JOHN LEY
CLERK

D.C. Docket No. 1:08-cv-21682-JLK

VALIDSA, INC.,
a Florida corporation,
d.b.a. Dexton Validsa,
d.b.a. Dexton, S.A.,

          Plaintiff-Counter Defendant-Appellee-Cross Appellant,

   versus

PDVSA SERVICES, INC.,
a Delaware corporation,

          Defendant-Appellant-Cross-Appellee,

BARIVEN S.A.,
a Venezuelan business entity,

          Defendant-Counter Claimant-Appellant-Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(April 21, 2011)

Before BARKETT and HULL, Circuit Judges, and SCHLESINGER,[*] District Judge.

PER CURIAM:

In this case involving contracts for the sale of foodstuffs, defendants-appellants PDVSA Services, Inc. ("PSI") and Bariven, Inc. ("Bariven") appeal the district court's grant of summary judgment to plaintiff-appellee Validsa, Inc. ("Validsa"), on Validsa's Amended Complaint alleging five breach of contract claims. PSI appeals the district court's summary judgment ruling that it was individually liable for the breaches despite being the agent of disclosed principal Bariven. Bariven appeals the district court's grant of Validsa's motion for summary judgment on all of Bariven's counterclaims against Validsa and denial of Bariven's motion for partial summary judgment on certain counterclaims. Both PSI and Bariven appeal the exclusion of the expert testimony of Dr. Miguel Herce from the bench trial on damages.

Validsa cross-appeals several rulings by the district court: (1) its exclusion of evidence of consequential damages on contract 757, allegedly breached by PSI and Bariven; (2) its decision that PSI and Bariven were entitled to an offset or recoupment of cash advances they made to Validsa; and (3) its ruling that Validsa

[*]Honorable Harvey E. Schlesinger, United States District Court Judge for the Middle District of Florida, sitting by designation.

2

was not entitled to prejudgment interest on three of the contracts allegedly breached by PSI and Bariven.

After review of the record, and with the benefit of oral argument, we affirm in part, reverse in part, and remand certain claims for trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Parties and Contracts

Plaintiff-appellee Validsa, Inc. ("Validsa") is a Florida corporation that operates as an international food commodities trader. Defendant-appellant Bariven is a wholly-owned subsidiary of Petróleos de Venezuela, S.A. ("PDVSA"), Venezuela's national oil company. Defendant-appellant PSI is a Delaware corporation that is a wholly-owned subsidiary of Bariven, and acts as Bariven's purchasing agent.[1]

In response to Venezuela's food shortage, in November 2007 PDVSA tasked Bariven with purchasing large amounts of foodstuffs on the international market. Bariven, in turn, had PSI perform many of the subsidiary tasks required in acquiring those large amounts of food. As part of this process, PSI accepted bids for delivery of certain foodstuffs. Validsa submitted the lowest bids for several of

---

[1]PSI is a wholly-owned subsidiary of Bariven, which is in turn an agency and instrumentality of the Bolivarian Republic of Venezuela and is itself a wholly-owned subsidiary of PDVSA.

3

the purchases, and PSI, on behalf of Bariven, then submitted purchase orders to Validsa; those purchase orders became the basis for the contracts at issue here.

In November 2007, PSI and Bariven awarded eight contracts worth a total of roughly $66 million to Validsa. Three of those November contracts, Nos. 326, for beef; 368, for chicken; and 405, for beef, were at issue in the district court. Like all of the contracts, these November 2007 contracts identified the purchasing party as:

> BARIVEN, S.A.
> c/o PDVSA Services, Inc.
> Purchasing Agent (BU00)
> 1293 Eldridge Parkway
> Houston, Texas 77077
> United States of America

Each of the contracts also directed Validsa to send invoices to "BARIVEN, S.A. c/o PDVSA Services, Inc." Validsa submitted its invoices to "BARIVEN, S.A. c/o PDVSA Services, Inc."

Subsequently, in March 2008, PSI and Bariven awarded Validsa two more contracts: No. 632, which called for the delivery of 100,000 metric tons of sugar at $446.92 per ton, for a total price of $44,692,000, of which 30% ($13,407,600) was paid in advance by Bariven; and No. 757, which called for the delivery of 24,000 metric tons of beef at $4,329.58 per ton, for a total price of $103,929,920, of

which 30% ($31,172,976) Bariven also paid in advance.  Thus, between these two March 2008 contracts, PSI and Bariven made approximately $44.580 million in advances to Validsa on total purchases of nearly $150 million.  Validsa was obligated to have insurance companies issue performance bonds in favor of PSI to secure the advance payments in the event that Validsa breached contract 632 or 757.  Under the contracts, the 30% advances were to be drawn down over time.

Due to the size of the March 2008 contracts (632 and 757), the goods contemplated by the contracts were to be delivered in installments, and Bariven was to pay 70% of the price of the installment within a certain period after each delivery.  The advances, therefore, constituted the other 30% of the payment for each installment.  Thus, the advances would not be fully drawn down until the last installment was delivered and paid for. In general, Validsa and other suppliers would provide PSI with delivery schedules known as "cronogramas," indicating when and how future deliveries would take place.  The delivery schedules would occasionally change over time for reasons such as vessel availability, container availability, capacity at ports of call, production capacity, and inspections.

To comply with its obligations under these contracts, Validsa entered into relationships with two suppliers.  It agreed to pay Pacific Atlantic Trading

5

Company $29,500,000 for the purchase of 100,000 metric tons of sugar, and to pay Quatro Marcos Ltd. $87,600,000 for 24,000 metric tons of beef.

**B.      Grounds for Insecurity**

1. Alleged Kickback Demand

According to Validsa, in March 2008, Validsa's principals Tomas Gonzalez ("Gonzalez") and Pablo Cardenas ("Cardenas") were approached by a Venezuelan businessman, Juan Carlos Chourio ("Chourio"), who demanded a $2 million kickback that he claimed was requested by Georges Kabboul ("Kabboul"), president of Bariven and PSI, to keep the contracts in place. Validsa asserts that Chourio has a family connection with Bariven's third-highest-ranking officer, who Validsa claims is a close confidant of Kabboul's. Bariven and PSI dispute some of these facts, as well as the import of the purported kickback demand. Kabboul, for instance, stated that he had never met Chourio and became aware of him only during this litigation. Additionally, PSI and Bariven point out what they say are inconsistencies in Validsa's principals' deposition testimonies about the kickback demand. Finally, PSI and Bariven dispute that there is any significance to the familial relationship between Chourio and the Bariven employee, stating that it is an attenuated relationship to an employee who has not been demonstrated to be involved in food procurement.

6

2. Rivas E-mail Received April 15

On April 15, 2008, Validsa received an e-mail string from Paolo Rivas ("Rivas e-mail"), a PSI employee. This string included an April 8, 2008 e-mail from Rafael Rosales ("Rosales"), an in-house attorney for Bariven. The e-mail was intended as an internal communication to employees of PSI and Bariven, and was sent inadvertently to Validsa. The e-mail was entitled "Dexton[2]-Suspension of PSO Meat-Demand for Delivery of Chicken" and read in part as:

> On the instructions of Mr. Georges Kabboul–effective immediately–you are instructed to cancel [Purchase Order] 757. Likewise, we request the current situation of the delay of chickens also purchased from this company, in any case you are instructed to suspend any payment if there is any. On the part of our Law Office, we request the documentation that shows the problems about the failure to deliver chickens.[3]

The string also included a second message that read:

> Per Mr. Georges Kabboul's instructions, please proceed to cancel Purchase Order No. 5100061757 [Contract 757] for 2400 [sic] MT of beef placed with Empresa [Company] Dexton . . . Likewise, it is instructed that any pending payment to said company be suspended.

As of April 15, 2008, the date Validsa received the e-mail containing these messages, Validsa had not delivered any beef under contract 757 or any sugar

---

[2]Dexton is a name that Validsa used in some of its business dealings.

[3]The original e-mail was in Spanish, and the parties use slightly different versions. The defendants-appellants' version is reproduced here; the differences in the translations are immaterial.

7

under contract 632. According to Bariven and PSI, Rosales sent the e-mails following meetings in Brazil with a supplier that raised concerns about Validsa's performance under some of the November 2007 contracts for chicken. Between April 8, when Rosales sent the e-mails, and April 15, when the e-mails were sent to Validsa, no one from Bariven or PSI informed Validsa that Bariven or PSI intended to cancel contract No. 757, and the companies did not seek the return of the $44.580 million in advance payments from Validsa.

3. April 17 E-mail and April 29 Meeting

On April 17, 2008, Validsa principal Gonzalez sent a letter to PSI requesting "immediately a written explanation of the situation that is set forth in this [Rosales] e-mail" and "demand[ing] an immediate response to this situation." Kabboul agreed to meet with Gonzalez.

Kabboul and Gonzalez met on April 29, 2008. They discussed the status of over 1,275 metric tons of chicken still undelivered under the November 2007 contracts and how to proceed under the March 2008 contracts. Kabboul proposed using the advance money as payment for the first $44 million in deliveries under the March 2008 contracts, then using letters of credit for the remaining deliveries. The parties could not agree on how to proceed, and Kabboul asked for a follow-up

meeting on May 2. Validsa agreed to this follow-up meeting, but for reasons not clear from the record, the meeting did not occur.

4. Validsa's May 9 and May 22 Letters

On May 9, counsel for Validsa sent Kabboul a letter requesting adequate assurances of performance within five days. PSI responded with a letter dated May 16, 2008, which stated in relevant part:

> [We] have [informed] your company several times that [] Validsa was not intended to be the recipient of [] [the internal communications contained in Ms. Rivas's e-mail of April 15], so they should not have [been] taken into consideration. For that reason, we find it very hard to understand how your company even takes the issue to a legal pre-claim communication.

On May 22, Validsa sent another letter to PSI regretting PSI's lack of a concrete response to Validsa's complaint and asking that PSI "normalize the late payments" on the contracts. PSI did not directly respond to this letter, but instead sent a new draft agreement to Validsa on June 3.

5. June 3 Draft Agreement

The June 3 draft agreement[4] was attached to an e-mail to Validsa from Alfonzo Gravina, Purchasing Manager for PSI, and contained a header stating "DRAFT WITH NO LEGAL OR COMMERCIAL VALUE [sic]." The draft

---

[4]Again, the original version of this e-mail was written in Spanish; we use the translation provided to the district court.

agreement stated that "[t]he Parties bind themselves to comply with each and every one of the reciprocal obligations deriving from the Purchase Orders with respect to the amounts to be delivered subsequent to" agreement on these new terms. This draft also contained, inter alia, a new delivery schedule, a forum selection clause, and, most importantly, language now naming PSI as the party responsible for paying the debts owed Validsa. The cover e-mail invited Validsa to "send to me . . . any comments you may have . . . ."

Validsa did not respond to this communication, or contact PSI or Bariven at all. Instead of contacting them, Validsa filed suit on June 12, 2008.

At the time this lawsuit was filed, Validsa alleged the status of the contracts was:

|  | March 2008 Contracts | | November 2007 Contracts | | |
|---|---|---|---|---|---|
| **Contract** | **632** | **757** | **326** | **368** | **405** |
| **Subject** | Sugar | Beef | Beef | Chicken | Beef |
| **Value** | $44.7 million | $103.9 million | $24.6 million | $21.4 million | $1.5 million |
| **Delivery Status** | No Delivery | 1 installment delivered | Complete | Complete | Complete |
| **Unpaid Balance** | 0 | 0 | $1,599,923 | $4,157,021 | $62,487 |
| **Advance Paid on April 2** | $13,407,600 | $31,172,976 | n/a | n/a | n/a |
| **Scheduled Delivery Date** | 9-Apr-08 | 30-Mar-08 | n/a | n/a | n/a |

The one installment delivered under March 2008 contract 757 constituted 427.3 metric tons of beef. Given the contract price of $4,329.58 per ton, this installment was arguably worth about $1,850,000.[5] At the time suit was filed, PSI and Bariven owed a total of $5,819,431 on the three November 2007 contracts and for the one delivery on contract 757, but, notably, Validsa still had Bariven's $44.580 million in advances.

## C. Claims and Counterclaims

---

[5]As discussed later, the district court ultimately awarded Validsa $1,298,821 in damages related to the goods delivered in this one installment on contract 757.

Validsa filed its original Complaint in the United States District Court for the Southern District of Florida on June 12, 2008, and an Amended Complaint on July 3, 2008. Counts I, II, and III of this Amended Complaint alleged breaches of the November 2007 contract Nos. 326, 368, and 405, respectively, claiming damages of $1,599,923; $4,157,021; and $62,487, for a total of $5,819,431.

Count IV alleged that PSI and Bariven anticipatorily repudiated contract 632 "by ordering the suspension of all payments to []Validsa under Contract 632 and subsequently failing to provide adequate assurance to []Validsa that they would honor Contract 632 on its agreed terms." Validsa sought compensatory damages of $23,234,250.00, "consequential and incidental damages in an amount to be determined, prejudgment and post judgment interest, costs, attorneys' fees, and any other relief deemed appropriate by the Court." Count V alleged that PSI and Bariven "anticipatorily repudiated Contract 757 and therefore materially breached the contract by ordering the cancellation of, and the suspension of all payments under, Contract 757, and by subsequently failing to provide adequate assurance to []Validsa that they would honor Contract 757 on its agreed terms." On this Count, Validsa sought actual damages of $1,298,821.11 for amounts owed to Validsa by Bariven for the one shipment under contract 757, lost profits of $16,309,920.00, and consequential damages "in excess of $113,562,600."

On November 4, 2008, PSI and Bariven answered, denying, <u>inter alia</u>, that they had anticipatorily repudiated contract Nos. 632 and 757. In the same pleading, Bariven brought counterclaims against Validsa. In Count I, Bariven alleged that Validsa breached contract 632 by failing to deliver any sugar after receiving approximately $13.4 million in advances from Bariven. In Count II, Bariven alleged that Validsa breached contract 757 when, after receiving approximately $31.1 million in advances from Bariven, Validsa delivered only one partial shipment of beef. Counts III and IV alleged unjust enrichment on contracts 632 and 757, respectively. Counts V and VI alleged a breach of the implied covenants of good faith, fair dealing, and commercial reasonableness. Finally, Count VII demanded an equitable accounting.

**D. District Court's Rulings on Breach of Contract Claims**

After the parties filed cross-motions for summary judgment, the district court invited each to submit proposed orders. On March 16, 2009, the parties each submitted proposed orders. On July 10, 2009, the district court adopted Validsa's proposed order in its entirety. <u>Validsa, Inc. v. PDVSA Servs. Inc.</u>, 632 F. Supp. 2d 1219 (S.D. Fla. 2009). The district court first determined that PSI and Bariven breached contract Nos. 326, 368, 405, and 757 by failing to pay for the goods actually delivered under those contracts. <u>Id.</u> at 1228.

13

1. Anticipatory Repudiation as to Contracts 632 and 757

Next, the district court addressed Validsa's claim that PSI and Bariven anticipatorily repudiated contracts 632 and 757. Under Fla. Stat. § 672.609, a party to a contract can make a written demand for adequate assurances of performance "[w]hen reasonable grounds for insecurity arise with respect to the performance of [the other party] . . . ." Id. § 672.609(1). Until the requesting party receives such adequate assurances, it "may if commercially reasonable suspend any performance for which [it] has not already received the agreed return." Id. When the parties to the contract are merchants, "the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards." Id. § 672.609(2). If the party receiving the demand does not provide adequate assurances within a reasonable time of no more than thirty days, that failure is treated as a repudiation of the contract, allowing the party requesting assurances to sue for breach. Id. § 672.609(4).

The district court determined that Validsa had numerous reasonable grounds for insecurity, including the alleged kickback demand by Chourio, the Rivas e-mail, and the fact that defendants were late in their payments on some of the November 2007 contracts. Validsa, 632 F. Supp. 2d at 1230-32. The district court

14

rejected defendants' argument that the advanced funds provided adequate security on the grounds that Bariven is "an agency of a foreign government" that "could stop paying [Validsa] at any time if it decided to do so" and because Validsa's security from the advances was reduced due to the required performance bonds. Id. at 1231 (emphasis added).

The district court also determined that Validsa requested adequate assurances at least twice: (1) in the April 17, 2008 letter sent by Validsa principal Gonzalez; and (2) in the May 9, 2008 letter sent to defendants by Validsa's legal counsel. Id. at 1233-34. The district court rejected defendants' argument that the April 17 letter was not a request for adequate assurances because it did not mirror the language of § 672.609(1), concluding that "there is no requirement that requests for assurances track the statute." Id. at 1234. It also disagreed with defendants' argument that Validsa could not request adequate assurances because Validsa was in breach of the contracts, determining simply that Validsa was not in breach. Id. at 1235-37.

As the final prong of its anticipatory repudiation analysis, the district court determined that the defendants did not provide Validsa with adequate assurances of performance. Id. at 1237-39. It rejected defendants' contentions that they had offered adequate assurances, such as in the April 29 meeting and the June 3 draft

proposal. Id. at 1238. The district court indicated that these proposed contract modifications might themselves qualify as repudiations of the contracts under Fla. Stat. §672.610. Id. at 1238-39.

2. Bariven's Counterclaims

The district court also granted summary judgment in favor of Validsa on all of Bariven's counterclaims and dismissed them with prejudice. First, it concluded that Bariven's counterclaims for breach of contract (Counts I and II) and breach of the implied covenant of fair dealing and commercial reasonableness (Counts V and VI) should fail because Bariven itself breached contracts 632 and 757, and a party in breach cannot itself maintain a claim for breach. Id. at 1242-43. Similarly, under Florida law, if a party cannot prove a breach of contract, its claims for breach of the implied covenant of fair dealing and commercial reasonableness also must fail. Id.

Bariven's unjust enrichment counterclaims (Counts III and IV) failed because, "under Florida law, an unjust enrichment claim must fail upon the showing of an express contract," and "[t]he parties . . . admitted to the existence of express contracts . . . ." Id. at 1243.

As to Bariven's equitable accounting counterclaim (Count VII), the district court stated that an equitable accounting requires "a fiduciary relationship or

16

complex transaction" and that the party seeking the accounting must have no adequate remedy at law.  Id. at 1244.  Because the court determined that there was no fiduciary relationship, the transaction was not complex, and Bariven had an adequate remedy at law, it granted judgment in favor of Validsa and dismissed the equitable accounting counterclaim.  Id. at 1244-45.

**E.  District Court's Evidence and Damages Rulings**

Following its summary judgment rulings, the district court held a bench trial on plaintiff Validsa's damages.  Before the trial, defendants filed a motion in limine to exclude evidence of damages Validsa claimed it sustained related to 20,369 extra tons of beef in an earlier version of contract 757, which was for 44,369 tons of beef.  The district court agreed that evidence of these damages should be excluded, concluding that contract 757 was changed to include only 24,000 tons of beef and that the damages sought were consequential in nature and therefore not recoverable under Florida law.

At the damages trial, PSI and Bariven had Dr. Miguel Herce testify as their expert witness regarding Validsa's alleged damages.  Dr. Herce, a valuations and economics expert, testified about Validsa's lost profits under contracts 632 and 757.  However, the district court excluded Dr. Herce's testimony as it related to

17

commissions Validsa may have owed to third parties and to future price changes, stating that the testimony was speculative and unsupported by the record.[6]

Following the damages trial, the district court issued its Findings of Fact and Conclusions of Law. It determined that Validsa was entitled to a total of $40,764,093.30 in damages, broken down as follows: (1) $1,551,331.00 for amounts owed under contract 326 in Count I; (2) $4,157,020.56 for amounts owed under contract 368 in Count II; (3) $62,487.95 for amounts owed under contract 405 in Count III; (4) $483,750 for incidental damages and $15,192,000 for lost profits (for a total of $15,675,750.00) under contract 632 in Count IV; and (5) $1,298,821.18 for goods delivered; $2,000,000 for incidental damages; and $16,018,682.59 for lost profits (for a total of $19,317,503.77) under contract 757 in Count V.

The district court ruled that Validsa was not entitled to prejudgment interest on any of these damages (totaling $40,764,093.93) because it had held the roughly $44.580 million in advances of defendants' money. Finally, the district court determined that defendants were entitled to a setoff of the approximately $44.580 million in advances, rejecting Validsa's claim that defendants had waived this defense.

---

[6]PSI and Bariven did make a proffer of Dr.Herce's excluded testimony.

## II. VALIDSA'S BREACH OF CONTRACT CLAIMS AND BARIVEN'S COUNTERCLAIMS

On appeal, defendants PSI and Bariven contend that the district court erred: (1) in granting summary judgment to plaintiff Validsa on its claims that PSI and Bariven anticipatorily repudiated contracts 632 and 757[7] and (2) in granting summary judgment to Validsa on Bariven's counterclaims on the bases that (i) Bariven had breached contracts 632 and 757 and thus could not maintain a breach of contract claim itself and (ii) certain of its claims failed upon the showing of an express contract.[8] PSI and Bariven argue globally that Validsa should not have been allowed to rely on anticipatory repudiation under Fla. Stat. § 672.609 because Validsa was itself in breach. In the alternative, defendants argue that issues of fact exist as to whether: (1) Validsa had reasonable grounds for insecurity; (2) Validsa made a written demand for adequate assurances; and (3) PSI and Bariven provided adequate assurances. Arguing that there was no

---

[7]On appeal, Bariven does not challenge the district court's finding that Bariven breached contracts 326, 368, and 405, as alleged in Counts I, II, and III, where all the goods contemplated by those contracts were delivered.

Bariven also does not dispute the district court's finding of liability for the $1,298,821 in goods delivered in the one installment under contract 757 in Count V. But Bariven does dispute liability for, and the amount of, the other damages (for lost profits and incidental damages) in Count V relating to contract 757.

[8]We review a district court's grant of summary judgment de novo. Shuford v. Fid. Nat'l Prop. & Cas. Ins. Co., 508 F.3d 1337, 1341 (11th Cir. 2007). We view all facts and make all inferences in the light most favorable to the non-moving party. Id.

19

anticipatory repudiation, Bariven contends that Validsa breached contracts 632 and 757 and that Bariven's counterclaims should be reinstated.

Under Fla. Stat. § 672.609(1), "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance . . . ." Id. Between merchants, the reasonableness of grounds for insecurity is "determined according to commercial standards." Id. § 672.609(2). Once a demand for assurances is made, the party receiving the request has a reasonable time not to exceed thirty days to provide "such assurance of due performance as is adequate under the circumstances of the particular case." Id. § 672.609(4). A failure to provide adequate assurances within that reasonable time is treated as a repudiation of the contract. Id.

"It is generally a question of fact whether a [party] has reasonable grounds for insecurity under [UCC] § 2-609. There are circumstances, however, where this issue may be resolved as a matter of law." BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 702 (2d Cir. 1993) (internal citations omitted). Likewise, whether any assurances offered are adequate under UCC § 2-609 is ordinarily a question of fact, but may be resolved as a matter of law when the evidence presented is such that a rational trier of fact could only arrive at one conclusion as to the issue. Kaiser-Francis Oil Co. v. Producer's Gas Co., 870 F.2d 563, 568 (10th Cir. 1989);

20

see also Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc., 615 F.3d 1352, 1361 & n.17 (11th Cir. 2010) (analyzing Georgia UCC provisions under reasonable jury standard and indicating that questions under equivalent Georgia provision are fact issues for jury). Thus, we must affirm the district court's summary judgment on the anticipatory repudiation issue unless we conclude that a reasonable trier of fact could find that Validsa lacked reasonable grounds for insecurity, that Validsa did not make a written demand for adequate assurances, or that PSI and Bariven provided Validsa with adequate assurances of performance. See Chapman v. AI Transp., 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (stating that no genuine issues of material fact exist unless there is enough evidence presented by a non-moving party for a reasonable jury to find in that party's favor).

We agree with the district court's summary judgment rulings as to contracts 632 and 757 that: (1) Validsa had reasonable grounds for insecurity; and (2) Validsa made a written demand for adequate assurances. However, fact issues exist as to whether PSI and Bariven provided adequate assurances, precluding summary judgment on this last issue. Among the evidence on which a trier of fact could base a conclusion that PSI and Bariven did provide adequate assurances as to contracts 632 and 757 is: (1) the various discussions at the April 29, 2008

21

meeting in Venezuela between Validsa principal Gonzalez and Kabboul; (2) the

letter sent from PSI and Bariven to Validsa on May 16, 2008, telling Validsa that

the April 15 Rosales e-mail was sent in error and to disregard its contents; (3) the

June 3, 2008 draft agreement proposed by PSI and Bariven[9]; and (4) the fact that

the approximately $44.580 million in advances had not been reduced much at all

by the one delivery under contract 757 and, importantly, neither PSI nor Bariven

had requested the return of any of the advance amounts.

Simply put, sufficient evidence exists in the record as a whole from which a

reasonable jury could conclude that defendants offered Validsa adequate

assurances of performance under the circumstances and thus did not anticipatorily

breach contracts 632 and 757.[10] Accordingly, we find (1) that the district court

---

[9]We discuss the June 3, 2008 draft agreement to illustrate how a reasonable trier of fact might find that PSI and Bariven gave adequate assurances. This draft agreement proposed substituting PSI for Bariven as the obligated party and changing the delivery schedule. A reasonable trier of fact might conclude that this proposal constituted an attempt by Bariven to get out of its obligations and that it detracts from the argument that PSI and Bariven gave adequate assurances. On the other hand, the trier of fact might conclude that PSI and Bariven were giving assurances to Validsa by offering to have Bariven's subsidiary PSI, as a company incorporated in the United States, obligated under the contracts as opposed to Bariven, an agency of a foreign nation. A trier of fact could also agree with PSI and Bariven that the proposed changes to Validsa's delivery schedule were merely tacit acknowledgments that, due to the parties' disputes, Validsa was unable to deliver the goods on the original schedule, and thus they constituted an effort to accommodate Validsa. In other words, the new proposed delivery schedule was possibly advantageous to Validsa as it gave Validsa more time to perform. Additionally, Bariven asked for Validsa's comments on the draft agreement.

[10]In this regard, we conclude Validsa made its request for adequate assurances as of April 17, and the UCC provides that a merchant has a reasonable time not to exceed thirty days to

erred in concluding, as a matter of law, that PSI and Bariven anticipatorily repudiated and breached contracts 632 and 757 and (2) that this case must be remanded for trial as to whether PSI and Bariven gave adequate assurances that they would perform contracts 632 and 757 and thus whether those contracts were or were not breached by Bariven. Accordingly, we vacate the grant of summary judgment in favor of Validsa on Counts IV and V of Validsa's Amended Complaint against Bariven and remand those counts for trial.[11]

Given this ruling, we also vacate the district court's summary judgment rulings that dismissed Counts I, II, V, and VI of Bariven's counterclaims, given this dismissal was based on the district court's finding that Bariven had breached the contracts as a matter of law.[12] Thus, we reinstate (1) Counts I and II of

respond to a request for adequate assurances of performance. Fla. Stat. § 672.609(4). The district court determined the defendants' anticipatory repudiation occurred on April 29, but that finding is inconsistent with the UCC and the facts. Defendant Bariven's thirty-day window had not closed yet, and, viewing the record as a whole, a jury could find Bariven's April 29 proposals were material changes indicating Bariven would not perform, or could find Bariven's proposals did not necessarily mean Bariven would refuse to perform the contracts. We note the district court's damage calculations did not appear to depend on the date the alleged repudiation occurred.

[11]Given our rulings that PSI and Bariven's communications regarding contracts 632 and 747 may have constituted adequate assurances of performance, we also reverse the district court's judgment that the proposed modifications constituted repudiations of those contracts. Validsa, 632 F. Supp. 2d at 1238-39.

[12]For purposes of Validsa's anticipatory repudiation claims, the district court determined that Validsa did not breach contracts 632 and 757 by failing to timely deliver the food and Validsa was thus not precluded from relying on the anticipatory repudiation provision of the UCC (Fla. Stat. § 672.609). Validsa, 632 F. Supp. 2d at 1235. Any delay by Validsa in its

23

Bariven's counterclaims, which alleged Validsa breached contracts 632 and 757, respectively, and (2) Counts V and VI of Bariven's counterclaims, to the extent Bariven alleged Validsa breached the implied duties of commercial reasonableness, good faith, and fair dealing as to contracts 632 and 757.[13]

However, we find no error in the district court's decision to dismiss Bariven's counterclaims for unjust enrichment in Counts III and IV on the basis that these claims fail on the showing of an express contract. We also find no error in the district court's decision to dismiss Bariven's counterclaim for an equitable accounting in Count VII on the grounds that there was no fiduciary relationship between the parties, the transaction was not complex, and Bariven had an adequate

---

deliveries resulted from the timing of the defendants' payments of the advances. Id. Moreover, the contracts did not contain a time-is-of-the-essence clause, the defendants did not object when they learned delivery would be delayed due to the timing of the advance payments, and defendants never notified Validsa that a delay in delivering the food constituted a breach of contracts 632 and 757. Id. at 1236-37 & n.17. So as of early June 2008, and as to delay in delivery, there was no breach by Validsa. We find no reversible error in this partial ruling.

We point out, however, that this does not resolve the issue of whether Validsa wrongly terminated the contracts by wrongly accusing defendants of anticipatory repudiation and thereby itself breached the contracts. In this regard, the only factual issue as to liability on contracts 632 and 757 is whether or not Bariven gave adequate assurances. If Bariven failed to give adequate assurances, then Bariven breached contracts 632 and 757. If Bariven gave adequate assurances and did not anticipatorily breach, then Validsa breached by wrongfully terminating contracts 632 and 757.

[13]We stress, as to Counts V and VI, that we reverse because the district court's dismissal was based on Bariven's having breached contracts 632 and 757 as a matter of law. Nothing herein examines or expresses any opinion on any other grounds raised in the district court as to Bariven's claims in Counts V and VI.

24

remedy at law. Because the dismissal of Counts III, IV, and VII was correctly decided on grounds other than Bariven's purported breach of the contracts, we affirm the district court's summary judgment rulings as to, and dismissal of, Counts III, IV and VII of Bariven's counterclaims.

### III. PSI'S INDIVIDUAL LIABILITY

In Florida, "[t]he law is well settled that an agent is not personally liable for the contract debts of a disclosed principal, absent an express agreement to the contrary." Kanov v. Bitz, 660 So. 2d 1165, 1165-66 (Fla. Dist. Ct. App. 1995). "If the contracting party knows the identity of the principal, the principal is deemed disclosed." Philip Schwartz, Inc. v. Gold Coast Graphics, Inc., 623 So. 2d 819, 820 (Fla. Dist. Ct. App. 1993).

In the district court, PSI argued that it should not be individually liable on the contracts because it was the agent of the disclosed principal Bariven and "did not express or imply an intent to itself be bound by the Contracts." Validsa, 632 F. Supp. 2d at 1239. Validsa contended, however, that PSI manifested an intent to be bound to the contracts, and the district court agreed. Id. at 1240. The district court pointed to: (1) testimony from PSI employees stating that they believed PSI would be liable in the event of a breach; (2) the fact that PSI negotiated the contracts; (3) a letter PSI gave to Validsa for presentation to third parties

25

describing PSI and Validsa's business relationship; and (4) the draft agreement, which removed Bariven as an obligated party and made PSI solely responsible for the debts under the contracts. Id. at 1240-42.

Given it is undisputed that PSI was the agent of the disclosed principal Bariven, the evidence in this case is not nearly the quantum required to hold the agent of a disclosed principal liable for the principal's obligations under Florida law. In Florida, "[a]bsent an express agreement, an agent acting for a disclosed principal is not personally liable for the debts of the principal." Andrew H. Boros, P.A. v. Arnold P. Carter, M.D., P.A., 537 So. 2d 1134, 1135 (Fla. Dist. Ct. App. 1989). While Florida courts do often cite the principle that an agent may be held liable when "circumstances show[] that personal responsibility was intended to be incurred," First Auto. Serv. Corp., N.M. v. First Colonial Ins. Co., No. 3:07-cv-682-J-32TEM, 2008 WL 816973, at *5 (M.D. Fla. Mar. 25, 2008), the courts rarely find liability in this situation.[14] Instead, the courts treat liability for agents as the rare exception, resulting in Florida law that an agent is not liable for the obligations of a disclosed principal "absent an express agreement to the contrary." Kanov, 660 So. 2d at 1165-66.

_____

[14]At oral argument, counsel for Validsa could point us to no published decision where the Florida courts actually held an agent liable for the obligations of a disclosed principal when the agent did not make an express indication of its intent to be bound.

26

In this case, Bariven was PSI's disclosed principal, and PSI never expressly agreed to be liable for Bariven's obligations. None of the evidence presented by Validsa—testimony from PSI employees, PSI's negotiation of the contracts on Bariven's behalf, the relationship-describing letter, and the draft agreement—shows any intent to be bound on PSI's part. Instead, this activity falls squarely into the agent immunity carved out in Florida law for "debts or obligations of the principal arising from contracts which the agent may negotiate or execute on behalf of . . . [a] disclosed principal." Sussman v. First Fin. Title Co. of Fla., 793 So. 2d 1066, 1068 (Fla. Dist. Ct. App. 2001). None of the evidence cited by Validsa demonstrates that PSI expressed an intent to be bound to the contracts, or manifested any intent contrary to its role as agent on behalf of disclosed principal Bariven.[15]

Given our determination that PSI did not express an intent to be bound by contracts 632 and 757, we conclude that the district court erred in granting Validsa's motion for summary judgment and in denying PSI's motion for summary judgment as to PSI's individual liability to Validsa. We therefore reverse and

---

[15]Validsa's citation of cases from other jurisdictions is unavailing. In this diversity action, the Florida's agency law governs.

remand to the district court with instructions to enter judgment in favor of PSI on Validsa's claims in its Amended Complaint.

## IV. EXCLUDED EVIDENCE

Each party appeals the district court's exclusion of certain evidence from the damages trial. PSI and Bariven appeal the district court's exclusion of certain testimony by their economics expert, Dr. Herce. Validsa appeals the district court's exclusion of its evidence relating to 20,369 extra tons of beef originally included in contract 757.

### A. PSI and Bariven's Economics Expert

At trial, Dr. Herce was allowed to testify about Validsa's damages on contracts 632 and 757. However, the district court excluded the portions of Dr. Herce's testimony relating to: (1) future cost increases for Validsa in obtaining sugar and beef to satisfy its contracts with PSI and Bariven; and (2) commissions Validsa would owe on future contracts with its suppliers.[16] The district court determined that Dr. Herce's testimony as to future price increases was speculative and that there was "no evidence in the record that there was any change" in the

___

[16]"We review for abuse of discretion the district court's decisions regarding the admissibility of expert testimony . . . ." United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004). We do not reverse unless the district court's decision is manifestly erroneous, and the district court enjoys considerable leeway in determining whether to admit expert testimony. Id.

28

future prices. Similarly, the district court concluded that Dr. Herce could not testify about the effect of commissions on Validsa's lost profits because "there's no contract . . . to pay . . . any commissions at all on contract 757." Because there was no evidence of an agreement to pay any commission on contract 757, the district court precluded Herce from testifying to the impact commissions would have had on Validsa's profits. Following the exclusion of this portion of Dr. Herce's testimony, PSI and Bariven submitted an offer of proof showing how Dr. Herce derived his calculations on the impact supply price fluctuations and commissions would have had on Validsa's lost profits.

On appeal, PSI and Bariven argue that Dr. Herce's testimony should have been allowed, because where there is a reasonable factual basis for an expert's opinion, the courts should not exclude his testimony. United States v. 0.161 Acres of Land, 837 F.2d 1036, 1040 (11th Cir. 1988). They assert that Dr. Herce's testimony was relevant and did have a reasonable factual basis. However, given the record here, we cannot say the district court abused its discretion in excluding this aspect of Dr. Herce's testimony. At best, Dr. Herce's testimony on both future price fluctuations and on commissions to be paid rested on a series of future events which were speculative. The contract between Validsa and its supplier allowed the supplier to renegotiate the price of the beef only if the delivery of the

beef was postponed past October 31, 2008. There is no evidence in the record indicating that if the contracts had proceeded (without the defendants' alleged breach), then deliveries would necessarily have happened after October 31, 2008. With respect to the price fluctuations, Dr. Herce's testimony therefore depended on (1) a delay of deliveries occurring under contract 757 past October 31, 2008; (2) that after October 31, 2008, Validsa and its supplier would have in fact agreed to change the price Validsa would pay; (3) that this price would represent an increase over the price they had previously agreed to; and (4) that the price would reflect rises in the Chicago Mercantile Exchange price and other sources, as assumed by Dr. Herce. Given the number of future events and steps required, the district court did not abuse its discretion in finding this testimony speculative.

Similarly, Dr. Herce's proposed testimony as to the impact of commissions on Validsa's lost profits involved conjecture. Dr. Herce's proposed testimony was that, in 2007, Validsa paid $2.2 million in commissions on net beef orders of $26,142,825, for a commission rate of 8.4%. Dr. Herce then proposed to apply this same commission rate to contract 757, which would result in a commission of $8,588,202, and would have decreased Validsa's profits by the same amount. However, this testimony would have: (1) assumed Validsa would pay commissions on contract 757 and (2) assumed that Validsa would pay the same

30

rate of commissions as it did on its 2007 beef contracts. There was no evidence Validsa would have owed the particular broker who it paid commissions for the 2007 contracts any commissions. Validsa only admitted that the broker had assisted in securing contracts generally, not that the broker was involved in securing contract 757 or that the broker was owed a commission. Given that the record does not contain any sort of broker contract or other contract contemplating the payment of commissions on contract 757, we cannot say that the district court abused its discretion in excluding this testimony either.

PSI and Bariven's reliance on 0.161 Acres of Land is unavailing. In that case, the defendant in an eminent domain action sought to have its expert economist testify about the price of similarly-situated land in recent transactions. Id., 837 F.2d at 1039. The district court excluded the expert's testimony, concluding that it was more prejudicial than probative, and would confuse the issues in the case. Id. at 1040. This Court reversed, finding that the excluded expert testimony was highly probative and that the district court abused its discretion in excluding it. Id. at 1042. This case presents a very different situation. In 0.161 Acres of Land, the expert's testimony was based on his 200-hour study of 145 land sales over an eight-year period in the relevant area. Id. at 1039. That testimony had a solid factual basis–it represented actual transactions

that parties had undertaken in the pertinent geographical area. Here, Dr. Herce's testimony related to transactions that Validsa might have entered into in the future given a hypothetical set of facts.

For all of these reasons, we find no reversible error in the district court's decision to exclude these portions of Dr. Herce's testimony based on the particular evidentiary foundation and questions at the first trial. However, given our reversal and remand for a new trial on the breach of contract issues, nothing herein precludes at the new trial testimony by Dr. Herce that has the requisite factual basis for his opinion testimony.

## B. Validsa's Consequential Damages

The district court granted defendants' motion in limine to exclude evidence of Validsa's consequential damages stemming from the alleged extra 20,369 tons of beef in contract 757. Validsa's Amended Complaint did not plead this extra 20,369 tons of beef, nor did Validsa raise that argument in the summary judgment stage.[17] The district court determined that contract 757 was for only 24,000 tons

---

[17]Validsa argues that its claim regarding the 20,369 tons of beef was pled in its Amended Complaint because certain parts of the purchase order attached to the Amended Complaint state that the required quantity of beef was 44,369 tons (i.e., 24,000 plus 20,369). But these documents do not change the fact that Validsa pled that the contract was for only 24,000 tons, and never mentioned the 44,369 number in the body of its Amended Complaint. Moreover, in merely referencing 44,369 tons, the purchase order does not explain the significance of that number or its relationship to the 24,000 ton figure alleged in the complaint.

of beef. Because contract 757 did not obligate the parties to sell and buy these additional 20,369 tons of beef, Validsa's claim necessarily was for consequential damages related to contract 757. The district court concluded that Florida law does not allow for the seller's recovery of consequential damages, and denied Validsa's attempt to recover these additional damages.[18] On appeal, Validsa contends that the additional profits it seeks are not consequential in nature, and that even if they are, Florida law might allow the recovery of consequential damages.

Consequential damages do not arise directly from the transaction between parties to a contract, "but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting." Hardwick Props., Inc. v. Newbern, 711 So. 2d 35, 40 (Fla. Dist. Ct. App. 1998). Given the determination that contract 757 was for 24,000 tons of beef, and the consistent pleading by Validsa, the district court did not err in concluding that any damages beyond those for 24,000 tons of beef were

---

[18]The questions whether: (1) the damages Validsa seeks to recover are consequential damages and (2) Validsa, as a seller, can recover consequential damages under Florida law are legal questions which we review de novo. See St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc., 561 F.3d 1181, 1186 n.10 (11th Cir. 2009) (stating we review legal questions de novo).

consequential damages. Thus, we must examine Florida law about consequential damages.

We agree with the district court that Florida law does not allow for recovery of a seller's consequential damages. In Florida Mining & Materials Corp. v. Standard Gypsum Corp., 550 So. 2d 47 (Fla. Dist. Ct. App. 1989), the Florida appellate court stated that, "While an aggrieved buyer may recover consequential damages for a seller's breach of contract . . . , an aggrieved seller is limited to recovering lost profits and incidental damages as its remedy for a breach of contract." Id. at 48. Validsa argues that we can ignore this ruling because the Florida Mining court "did not consider other provisions of the [U.C.C.]" and that we can disregard the Florida appellate court's decision if "there is persuasive evidence that the highest state court would rule otherwise." Pendergast v. Sprint Nextel Corp., 592 F.3d 1119, 1133 (11th Cir. 2010) (quotation marks omitted). The former statement is unpersuasive, and while the latter statement is a valid formulation of law, Validsa has not presented sufficient evidence to suggest that the Florida Supreme Court would rule that consequential damages are available to an aggrieved seller. Therefore, we affirm the district court's ruling excluding evidence of Validsa's alleged consequential damages related to the additional 20,369 tons of beef.

## V. PREJUDGMENT INTEREST

Under Florida law, "neither the merit of the defense nor the certainty of the amount of loss affects the award of prejudgment interest." Argonaut Ins. Co. v. May Plumbing Co., 474 So. 2d 212, 215 (Fla. 1985). Instead, "the loss itself is a wrongful deprivation by the defendant of the plaintiff's property," and "[p]laintiff is to be made whole from the date of the loss once a finder of fact has determined the amount of damages and defendant's liability therefor." Id. Put more succinctly, under this "loss theory," if "a verdict liquidates damages on a plaintiff's out-of-pocket, pecuniary losses, plaintiff is entitled, as a matter of law, to prejudgment interest at the statutory rate from the date of that loss." Id.[19]

While the above language is definitive about plaintiffs' entitlement to prejudgment interest, "[t]his general rule is not absolute." Broward Cty. v. Finlayson, 555 So. 2d 1211, 1213 (Fla. 1990). Instead, "'[i]nterest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable.'" Id. (quoting Flack v. Graham, 461 So. 2d 82, 84 (Fla.

---

[19]A party's entitlement to prejudgment interest is a question of state law that we review de novo. Millenium Partners, L.P. v. Colmar Storage, LLC, 494 F.3d 1293, 1304 (11th Cir. 2007).

1984)).  Thus, "the law is not absolute and may depend on equitable considerations."  Finlayson, 555 So. 2d at 1213.

The district court determined that Validsa was not entitled to recover prejudgment interest on any of the contracts, saying it had "failed to sustain its burden of proof that it paid its own funds (or was deprived of its own funds) during these contracts, justifying prejudgment interest."  The district court rejected Validsa's argument that, at least, the money advanced on contracts 632 and 757 should not apply to amounts due under contracts 326, 368, and 405, finding that "it would be unfair and inequitable to award Plaintiffs any prejudgment interest because Plaintiff's damages do not exceed the amount which it was advanced."  The district court found that Validsa did not suffer a loss of money because it held PSI's and Bariven's advances at the time of trial.  The district court additionally found that, had PSI or Bariven breached any of the contracts, they could do nothing to prevent Validsa "from using Defendant's money in its control to off-set money it was owed under the other contracts."  The court concluded that Validsa had possession of the advance payments before PSI or Bariven breached any of the five contracts at issue, and consequently Validsa did not suffer a loss of money under any of those contracts.  Given these facts, the district court concluded that

any award of prejudgment interest to Validsa would constitute a windfall, "a result that the courts of Florida do not countenance."

On appeal, Validsa argues that (1) the damages amount due under the November 2007 contracts was "a liquidated amount and Validsa was entitled to prejudgment interest on it" and (2) "the advances had nothing to do with the 2007 Contracts and did not reduce the amount owed under the 2007 Contracts," and therefore it was error to take the advances into account when analyzing the parties' obligations under the November 2007 contracts. Validsa asserts that there was an undisputed amount owed under the November 2007 contracts, that liability arose as of agreed-upon dates, and that interest should have been awarded from those dates as a matter of law.

After review, we agree with the district court's conclusion that awarding prejudgment interest to Validsa would have resulted in an inequitable windfall.[20] The district court determined, and Validsa does not appear to dispute, that Validsa possessed the advances prior to payment on any of the November 2007 contracts becoming due. As such, Validsa suffered no deprivation of funds of the type that prejudgment interest is designed to remedy. Thus, even though Florida law generally calls for the award of prejudgment interest, "the law is not absolute and

---

[20]We also find no error in the district court's set-off rulings.

may depend on equitable considerations." <u>Finlayson</u>, 555 So. 2d at 1213. In this case, the district court properly determined that awarding prejudgment interest to Validsa would result in a windfall and used the equitable discretion allowed by <u>Finlayson</u> to deny Validsa that windfall. We cannot say that the district court abused its authority under Florida law.

## IV. CONCLUSION

As to defendant PSI, we find that the district court erred in concluding PSI was individually liable to Validsa under the contracts. We reverse and remand for entry of judgment in defendant PSI's favor on Validsa's claims against PSI individually.

As to Validsa's damage claims against Bariven under the November 2007 contracts, 326, 368, and 405, and the first delivered installment of contract 757, we affirm the district court's rulings as to prejudgment interest and setoff.

As to contracts 632 and 757, we affirm the district court's rulings that, as a matter of law, Validsa had reasonable grounds for insecurity and that Validsa requested adequate assurances. However, we reverse the district court's ruling that, as a matter of law, defendant Bariven (itself or through its agent PSI) did not give adequate assurances of performance, and remand to the district court for a trial as to whether Bariven (itself or through its agent PSI) provided adequate

assurances. Because this factual issue will govern whether Bariven anticipatorily breached contracts 632 and 757, we reverse the district court's dismissal of Counts I, II, V, and VI of Bariven's counterclaims regarding contracts 632 and 757, which was based on the district court's summary judgment ruling that Bariven breached those contracts as a matter of law.

We affirm the district court's dismissals of Counts III, IV, and VII of Bariven's counterclaims, as those dismissals were based on grounds other than the above breach of contract finding.

Given that we remand for a trial on the above factual issues as to contracts 632 and 757, we also affirm, for purposes of retrial, the district court's evidentiary rulings on consequential damages and Dr. Herce's testimony.

In short, if the district court finds, after trial, that Bariven provided adequate assurances of performance, Bariven would not be liable to Validsa and Validsa would not be entitled to recover any damages as to contracts 632 and 757. The district court would then consider Bariven's breach of contract and breach of good faith and fair dealing counterclaims (Counts I, II, V, and VI). If, however, the district court finds, after trial, that Bariven failed to provide Validsa with adequate assurances of performance, and thus anticipatorily breached contracts 632 and 757, Bariven would lose on its counterclaims, and Validsa would be entitled to

recover the same damages that the district court previously awarded following summary judgment.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**